Filed 4/2/13  Modified and certified for publication 4/24/13 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| LEROY BROWN et al., | B238357 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC433800) |
| v. | |
| MID-CENTURY INSURANCE COMPANY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard Rico, Judge.  Affirmed.

Donna Bader and Donahue & Horrow, Michael B. Horrow, for Plaintiffs and Appellants.

Stone & Hiles, David L. Schaffer, and Greines, Martin, Stein & Richland, Robert A. Olson and Gary J. Wax, for Defendant and Respondent.

_____

## INTRODUCTION

Leroy and Terrie Brown appeal the trial court's judgment in favor of defendant and respondent Mid-Century Insurance Company on the Browns' claims for breach of contract and breach of the implied covenant of good faith and fair dealing. The trial court concluded that the Browns' claim for water damage caused by a broken pipe in their house was not covered under their Mid-Century policy and that Mid-Century was entitled to summary judgment. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Water*

On or about February 18, 2009 the Browns began observing condensation on the windows of their three-story, split-level home and on the drywall around the windows. There was moisture from the windowsills running down the walls and mildew on some of the windows and walls. When they cleaned the condensation off the windows, it returned the next day. About a week later, the Browns began noticing mold forming around the inside of their windows and on the walls in the living room and kitchen, "developing everywhere simultaneously." Every room that had a window had mold or mildew.

On March 17 or March 18, 2009 Leroy Brown's brother, Robert Brown, crawled under the house and observed moisture. Robert Brown testified at his deposition that he shined a flashlight into the crawl space and observed damp soil. Leroy Brown testified that he was not able to see the source of the water, nor did he hear anything like water spraying. After his brother came out of the crawl space, Leroy Brown shut off the water to the house, told his wife about the problem, and then either he or his wife called the insurance agent.

On March 18, 2009 the Browns hired a plumber, Michael Lewis, to find and fix the leak. Leroy Brown took Lewis to the laundry room, where there was moisture on the walls. Lewis testified in his deposition that when Mr. Brown took him to a hallway and the laundry area, he could see condensation and moisture on the walls. Lewis told Mr. Brown that "from experience, it seemed like . . . he had a hot water leak. And because his home was on slab, it probably was underneath the cement." Lewis did a

2

couple of tests and determined that it was hot water. Lewis testified that he told Mr. Brown that "the leak was on the hot water side. And in that situation, I told him that when you have a slab house, that sometimes you can't – you can't find the leak because water [has] a way of traveling. The leak could have been anywhere in the bottom floor of the house, and because it already had made a path, the water was just trickling, you know, wherever it was coming out at. And I told him, pretty much because we had the most damage in the laundry room, that nine times out of ten, it was going to be in the laundry room."[1]

Lewis also went into the crawl space under the house where he encountered mud and discovered a pool of water that appeared "pretty deep." While Lewis was in the crawl space, Mr. Brown turned on the water "very low" so Lewis could determine where the water was coming from. Lewis observed that water was coming into the crawl space from the backside of a vertical pressurized copper hot water line attached to the hot water manifold.

Lewis then went into the laundry room and began drilling with a jackhammer and searching for the hot and cold water manifolds, with the water system still off. When he located the hot water manifold, he "got the pipe exposed and [saw] the leak." With the water turned on "very low," Mr. Brown went back into the house and observed "water coming from an open hole in the pipe," which "was just a drip out at that point, just enough to show me where the water was coming out . . . the back side of the pipe." The water was coming out at "a slow pace, because [Leroy Brown] did not turn it on full blast."

The Browns notified Mid-Century of the problem.

---

[1] Lewis further explained: "Once water – a pipe burst or anything like that leaks and if it's underground, once it makes its path . . . to where it finds an opening where it can come out at, that doesn't mean that that's where the leak is. That's just . . . where it found a place to come out at . . . . So I wanted to explain that to him so he could know. Because once I went under the house and [saw] the pipes coming up on the foundation part of the house, I told him it was possible that it could be right there, but, also, it could be further. And if it was further than what we agreed on, you know, trying to find it, then the best solution would be to reroute the hot water system."

B. *The Policy*

Mid-Century had issued the Browns a "Farmers Next Generation Homeowners Policy" providing them with first party property damage coverage for structural damage in the amount of $404,000, with a $1,000 deductible. The policy insured some, but not all, of the Browns' property and stated "[c]overage is dependent upon both the (1) cause of the loss or damage and (2) type of loss or damage." The policy listed certain types of loss or damage that were not covered under the policy, "however caused," including "loss or damage consisting of, composed of or which is water damage." The policy included an "extension of coverage" that provided "limited" water damage coverage "for direct physical loss or damage to covered property from direct contact with water, but only if the water results from . . . [¶] (4) a sudden and accidental discharge, eruption, overflow or release of water . . . [¶] (i) from within any portion of: (a) a plumbing system." The policy described what was not included in the limited water damage coverage: "A sudden and accidental discharge, eruption, overflow or release of water does not include a constant or repeating gradual, intermittent or slow release of water, or the infiltration or presence of water over a period of time. We do not cover any water, or the presence of water, over a period of time from any constant or repeating gradual, intermittent or slow discharge, seepage, leakage, trickle, collecting infiltration, or overflow of water from any source . . . whether known or unknown to any insured."

For mold, the policy stated: "We do not insure loss or damage consisting of, composed of, or which is fungi. Further, we do not insure any remediation." The policy also contained the following exclusion: "'We do not insure loss or damage directly or indirectly caused by, arising out of or resulting from fungi or the discharge, dispersal, migration, release or escape of any fungi. Further, we do not insure any remediation . . . . '" The policy defined fungi as "any part or form of fungus, fungi [or] mold . . . ."

C. *The Investigation*

On March 20, 2009 Mid-Century claim representative Seann Clifford inspected the Browns' home and took photographs of the laundry room and the adjacent

4

crawlspace. Clifford "observed pervasive, visible mold and moisture on the interior walls of each level" of the Browns' home. Clifford stated in his declaration that Mr. Brown took him to the laundry room and showed him "the horizontal section of the piping which had been leaking. The section, which was part of a pressurized hot water line attached to the hot water manifold, was heavily corroded near a 90 degree angle bend. The horizontal section of the pipe below the bend had been embedded in the room's concrete slab foundation." Clifford inspected the pipe and "observed and photographed a hole in the pipe approximately 1/8 inch in diameter in the section of pipe that had been embedded in the room's concrete foundation," and saw that the "hole was facing down."

Mid-Century then assigned the Browns' claim to another claims representative, Rosie Acevedo, who inspected the home the next day, March 21, 2009. Acevedo observed mold on the walls in the laundry room, the office, the second floor living room, the kitchen, and the third floor bathrooms, and on clothing in a room next to one of the bathrooms. The Browns told Acevedo, in recorded statements, that they began noticing evidence of a water leak, condensation on the windows, and mold, approximately one month earlier. The Browns also told Acevedo that the condensation stopped forming on the windows when they turned off the hot water on March 17, 2009.

On March 23, 2009 Mid-Century retained American Leak Detection to inspect the house and determine whether there were any more leaks in the plumbing system. American Leak determined that the interior plumbing system was "'sound'" and that there were no other leaks.

On March 27, 2009 Mid-Century denied the Browns' claim. Acevedo wrote the Browns and stated that Mid-Century's "investigation revealed that the pipe in the wall of the laundry room that runs into your crawl space has been leaking water into your crawl space over a period of time causing condensation and mold growth through out [*sic*] your home. Unfortunately, this loss is uninsured or excluded from coverage under your policy." Acevedo determined that "the cause of loss was wear and tear which caused a hole in the pipe, allowing water to leak into the crawl space over a period of time." Acevedo then quoted at length various provisions in the policy, including the extension of

limited water coverage for "sudden and accidental discharge, eruption, overflow or release of water" from a plumbing system or household appliance.

D. *The Action*

The Browns filed this action on March 16, 2010, alleging causes of action for breach of written contract, breach of the implied covenant of good faith and fair dealing, negligence, fraud, unfair competition, and declaratory relief. The Browns allege that their "home was damaged when a plumbing pipe burst causing Plaintiffs substantial loss." On May 20, 2010 the Browns dismissed their causes of action for negligence, fraud, unfair competition, and declaratory relief, leaving only their causes of action for breach of contract and breach of the implied covenant. Mid-Century answered on June 17, 2010.

E. *The Motion for Summary Judgment*

On August 5, 2011 Mid-Century filed a motion for summary judgment or in the alternative for summary adjudication on the Browns' claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and for punitive damages. Mid-Century argued that it did not breach the policy or act in bad faith because the water damage in the Browns' home was caused by a long-term, gradual, incremental discharge or release of water, and not by a sudden and accidental discharge or release of water. Mid-Century also argued that its interpretation of the policy was reasonable and that it did not engage in any conduct that could justify a claim for punitive damages.

In support of its motion Mid-Century submitted the declarations of Clifford and Acevedo, as well as an expert declaration by Claude LeBlanc. LeBlanc is a licensed plumbing contractor with 33 years of experience investigating, diagnosing, repairing, and replacing "more than 500 broken pressurized hot water lines in residential plumbing systems," with expertise in "leak detection, duration, and causation and plumbing repair and design." LeBlanc stated that on June 14, 2011 he inspected the 24-inch section of pipe that had been removed from the Browns' house and found "a jagged hole which measured approximately 1/8 inch in diameter . . . surrounded by corrosion." LeBlanc also reviewed 89 color photographs taken by Clifford depicting "the failed section of pipe

6

before the section was cut out and preserved," which showed that "the failed section was encased in the concrete slab floor of the home's laundry room which was adjacent to a crawl space that had a dirt floor under the home's second floor."

LeBlanc noted from the photographs that "the portion of the pipe embedded in concrete was not wrapped with a plastic protective sleeve," in violation of the California Plumbing Code, California Code of Regulations, title 24, part 5, sections 313.2 and 313.10.1.[2] According to LeBlanc, these regulations require "copper pipes embedded in concrete to be wrapped with a plastic sleeve which serves to protect the pipe from coming into direct contact with the corrosive metallic elements present in concrete," because otherwise "[t]hese corrosive elements will gradually cause corrosion damage to the exterior wall of a copper pipe." LeBlanc gave his opinion that "the hole in the section of copper pipe" he inspected "had formed as a result of ordinary wear and tear to the pipe which corroded because it had been defectively embedded into concrete without the required protective sleeve. . . . Based on the heavy corrosion evident on the exterior of the pipe during my inspection and the photographs I reviewed depicting the pipe before it was removed, it was obvious the section which failed had not been sleeved at the time it was installed." LeBlanc stated that the pipe's "direct contact with these corrosive metallic elements" caused a "slow, gradual and incremental deterioration of the pipe's outer wall . . . near the pipe's bend," which in turn "caused a pinhole-sized opening in the pipe to form through which hot water slowly dripped out." LeBlanc added that the deterioration process then accelerated because (1) hot water has "higher levels of corrosive minerals than cold water" (because it is heated in a metal heater), (2) hot water

---

[2]    The California Plumbing Code is part of the California Building Standards Code. Building standards approved or adopted by the California Building Standards Commission become part of the Building Standards Code. (See *Plastic Pipe & Fittings Assn. v. California Building Standards Com.* (2004) 124 Cal.App.4th 1390, 1398, 1404-1406.) Section 313.2 provides: "No plumbing piping shall be directly embedded in concrete or masonry." Section 313.10.1 provides: "Sleeves shall be provided to protect piping through concrete and masonry walls and concrete floors."

escapes "under 55 to 80 p.s.i. of water pressure," and (3) "the water pressure striking the concrete" creates friction.

LeBlanc opined that the "hot water which first escaped from the pipe was in the form of drips into the concrete which surrounded the pipe. As the size of the hole slowly increased, this dripping gradually turned into leakage. Eventually, the escaping water migrated to the adjacent dirt floor of the nearby crawlspace and slowly pooled there. This unabated continuous dripping and leaking lasted at least five months until the leak was discovered and the water turned off on March 17, 2009." LeBlanc also reviewed water bill and service records for the home, compared them to the previous year, and concluded that the Browns' monthly water consumption increased during the period water was escaping from the pipe and then decreased to normal levels after the repair.

The Browns opposed the motion and submitted an expert declaration by Harvey Kreitenberg, a licensed journeyman plumber whose "primary occupation is a forensic consultant plumber." Kreitenberg also examined and photographed the pipe section and found two holes, one approximately 3/32 inch by 1/8 inch and one approximately 1/32 inch. Kreitenberg agreed that the pipe "failed due to a yet to be identified form of corrosion." Kreitenberg concluded that what had occurred "can be best described as a sudden breach of the pipe. This type of corrosion failure mechanism usually produces a sudden breach in the wall of the pipe, creating a non water tight condition. As the corrosion process continues, the size of the breach increases, ultimately producing a mist, stream and spray of water through the breach. It would have taken a mere fraction of [a] second (a 'nano' second' [*sic*]) between the water tight and non water tight condition of the pipe in the Brown residence, which is the breach in the pipe."[3] Kreitenberg concluded that the pipe "failed suddenly, and ultimately a spray or stream (not drips) of hot water shot through the holes in the pipe out into the area of the house where the pipe was located," and that "[h]ot water would have continued to spray and stream (not drip) out the holes until the water line was shut off."

---

[3]     A nanosecond is one billionth ($10^{-9}$) of a second.

F.  *The Ruling*

The trial court granted Mid-Century's motion for summary judgment, finding that none of the evidence submitted by the Browns "creates a dispute of fact as to the cause of the leak as set forth by Mid-Century's expert."  The court found that Kreitenberg's opinion that "the pipe's breach only took a faction of a second does not mean that release of water was 'sudden.'"  The court also noted that the Browns "do not dispute that the pipe leaked over a period of one to two months, and that the leak was caused by corrosion which wore away at the pipe," and that the evidence presented by Kreitenberg "shows that the release of water was a 'gradual . . . release of water . . . over a period of time,' and not 'a sudden . . . discharge, eruption, overflow or release of water.'"

The trial court entered judgment in favor of Mid-Century on November 3, 2011. Mid-Century gave notice of the entry of judgment on November 8, 2011, and the Browns filed a timely notice of appeal on January 6, 2012.

**DISCUSSION**

A.  *Standard of Review*

Rulings on motions for summary judgment are reviewed de novo.  (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 60; see *Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749, 757 ["[b]ecause summary judgment can raise only questions of law, we review the trial court's ruling without deference"].)  "The standard of review is the same regardless of whether the trial court grants or denies a summary judgment motion."  (*Benson v. Superior Court* (2010) 185 Cal.App.4th 1179, 1184-1185.)

"'"While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply."'"  (*Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1204; see *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 499-500.)  "Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation."  (*TIG Ins. Co. of Michigan v. Homestore, Inc.* (2006) 137 Cal.App.4th 749, 755; see *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18; *Whittaker Corp. v. Allianz Underwriters, Inc.* (1992) 11 Cal.App.4th 1236, 1238.)  "The rules governing policy interpretation require us

9

to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." (*Waller*, *supra*, 11 Cal.4th at p. 18.) The mutual intention of the parties governs the interpretation of the policy, which is "inferred, if possible, solely from the written provisions of the contract." (*Ibid.*) "'The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage," controls judicial interpretation.'" (*Ibid.*; see *In re Insurance Installment Fee Cases* (2012) 211 Cal.App.4th 1395, 1409.)

      B.  *Breach of Contract*

The Browns concede that they had the burden (1) "of proving their water damage is covered under their policy with Mid-Century," and (2) "to present facts showing a 'sudden release' of water, causing damage to their home."[4] (See *Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1191-1192.) The Browns do not argue that Mid-Century failed to meet its initial burden on summary judgment to show that the damage was not caused by a sudden discharge of water. They do not dispute that the evidence Mid-Century presented regarding the gradual deterioration of the pipe, the small size of the hole, and the existence of the effects of the water for at least a month or two, satisfied Mid-Century's initial burden on summary judgment. The Browns contend that in response to Mid-Century's showing they "presented admissible evidence supporting the finding of a triable issue on this fact." We disagree.

      1.  *There was not "a sudden and accidental discharge, eruption, overflow or release of water"*

The Browns' primary argument on appeal is that Kreitenberg created a triable issue of fact by stating in his declaration in opposition to Mid-Century's motion for summary judgment that "the pipe burst suddenly—in a 'nano-second,' spraying water in the crawlspace." This testimony, however, does not change the fact that the release of water, even if it commenced with a nanosecond "breach in the wall of the pipe" and

---

[4]    Because there is no dispute that the discharge of water in the Browns' home was accidental, the only issue is whether the discharge was "sudden."

resulted in a "mist, stream and spray," was constant or intermittent, and occurred over a period of "a month or two" (according to the Browns) or five months (according to Mid-Century). Even if, as Kreitenberg testified, the pipe "failed suddenly," the water damage according to Kreitenberg resulted from hot water "continu[ing] to spray and stream (not drip) out the holes until the water line was shut off." The Browns' policy with Mid-Century did not cover such a "'constant or repeating . . . intermittent or slow release of water,'" whether the release was a drip, spray, or stream.[5] As the trial court recognized, "everybody agrees," even Kreitenberg, "that this was something that occurred over a period of time." Thus, whether the water leaked or sprayed or streamed out of the hole(s) in the pipe, the water leaked, sprayed, or streamed out constantly and gradually over time. Such a water discharge does not qualify as "sudden" under the plain meaning of the terms of the Browns' policy.

Nor does it qualify as "sudden" under California law. "'Sudden' has a temporal element and does not mean a gradual or continuous discharge." (*Standun, Inc. v. Fireman's Fund Ins. Co.* (1998) 62 Cal.App.4th 882, 889; see *Travelers Casualty &*

---

[5] There is actually no admissible evidence in the record that water was spraying, as opposed to leaking, out of the pipe. The only witness the Browns claim saw a spray was Robert Brown, but the Browns did not submit any testimony from him. The Browns assert on appeal that Robert Brown "physically inspected the crawlspace under the laundry room and observed a 'constant spray of water,' which was not a slow trickle or leak." In support of this assertion the Browns cite to excerpts of a recorded statement by Leroy Brown submitted by Mid-Century that was not properly authenticated and constituted inadmissible hearsay by Leroy Brown repeating a statement by his brother. (See *Stockinger v. Feather River Community College* (2003) 111 Cal.App.4th 1014, 1027-1028.) Moreover, the (inadmissible) statement attributed by Mr. Brown to his brother does not unequivocally state that water was spraying rather than leaking, but states that there was "a constant flow . . . of water that was . . . a constant, you know, spray . . . or running of water." The Browns also cite to an unauthenticated document containing multiple levels of hearsay entitled "Claims Summary/I-Log Details." This log includes a March 21, 2009 entry by a Mid-Century employee repeating a statement by Mr. Brown memorializing a statement by Robert Brown: "Brother came over on 3/17/09 and went into crawl space and saw alot of water on ground. He saw water coming from pipe. He saw a constant spray of water coming out of the pipe facing crawl space not wall."

*Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440, 1455 ["the interpretation of 'sudden' must include a temporal component; otherwise, the word is rendered mere surplusage"]; *Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 754 ["[w]e cannot reasonably call 'sudden' a process that occurs slowly and incrementally over a relatively long time, no matter how unexpected or unintended the process"].) In the context of the phrase "sudden and accidental," the word sudden "*must*, if it is to be anything more than a hiccup in front of the word 'accidental,' convey a temporal meaning of immediacy, quickness, or abruptness." (*ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1786.) Thus, "whatever 'sudden' means, it does not mean gradual. The ordinary person would never think that something which happened gradually also happened suddenly." (*Id.* at p. 1788.)

The nature of the gradual water discharge from the Browns' pipe (even if initiated by a nanosecond breach in the wall of the pipe) and of the incremental effects of the water on the Browns' house precludes any finding that the discharge was sudden. (See *Freedman v. State Farm Ins. Co.* (2009) 173 Cal.App.4th 957, 964 ["[g]iven the small size of the hole(s) through which the water leaked, and given the extensive amount of water damage . . . , the leak must have lasted a sufficiently long time, or stopped and started sufficiently many times, to count as 'continuous' or 'repeated' under any reasonable construction of those terms"]; *Truck Ins. Exchange v. Pozzuoli* (1993) 17 Cal.App.4th 856, 860 ["[a]ny continuous event, whether it be of 30 years' or 2 months' duration, is simply not 'sudden'"].) A dishwater hose breaking in mid-cycle, a water heater giving out and flooding a room, or an overflowing toilet, is a sudden discharge of water. (See, e.g., *De Bruyn v. Superior Court* (2008) 158 Cal.App.4th 1213 [overflowing toilets sudden and accidental]; but see *Cardio Diagnostic Imaging, Inc. v. Farmers Ins. Exchange* (2012) 212 Cal.App.4th 69, 71 [malfunctioning toilet that failed to shut off water intake and overflowed because of blockage in the sewer line was not covered because of exclusion for loss or damages caused by water "that backs up or overflows from a sewer"].) A spray/stream/leak of water over several months is not.

Kreitenberg's opinion that the nanosecond "breach in the pipe" converted the pipe from a water-tight condition to a non-water-tight condition in an instant did not create a factual issue regarding whether the release of the water was sudden. Those courts that have considered the theory espoused by Kreitenberg have rejected it. For example, in *Saint Paul Surplus Lines Ins. Co. v. Geo Pipe Co.* (Tex.Ct.App. 2000) 25 S.W.3d 900, the court stated: "According to [the insured], the fact that the leak was not discovered for a lengthy period of time does not negate the temporal suddenness with which the breach occurred. This argument has been described as the 'metaphysical moment' theory. Under the logic of this theory, every event or condition not existing from the dawn of time would be considered 'sudden' because at one moment it did not exist and the next moment it did." (*Id.* at p. 905.) The court held that while "the time of discovery does not control whether the discharge was sudden," a "discharge that continues over a lengthy period of time cannot be considered 'sudden' as a matter of law." (*Ibid.*)

Similarly, in *American Ins. Co. v. Fairchild Industries, Inc.* (E.D.N.Y. 1994) 852 F.Supp. 1173, affd. (2d Cir. 1995) 56 F.3d 435, the court rejected the insured's "argument that the pipe failure was 'sudden' despite the fact that the process leading to the crack was a gradual one. It is apparently [the insured's] position that there was some metaphysical moment before which the leak was not present. And thus, when the leak finally manifested itself, it was an abrupt event." (*Id.* at p. 1182, fn. 18.) The court noted that "[u]nder this type of reasoning, no event whatsoever could conceivably" not be sudden. (*Ibid.*; see *Federated Mutual Ins. Co. v. Botkin Grain Co.* (10th Cir. 1995) 64 F.3d 537, 540-541 [rejecting the insured's argument that "the temporal quality ascribed to the word 'sudden' should be applied to the inception rather than the duration of the pollution"]; *SnyderGeneral Corp. v. Century Indem. Co.* (N.D.Tex. 1995) 907 F.Supp. 991, 1001 ["the metaphysical moment principle," which "suggests that every leak occurs suddenly because there will always be an instant in time when a once nonexistent leak 'suddenly' develops," would "read the temporal component of the term 'sudden' out of the Policy"], affd. in part and vacated in part on other grounds, (5th Cir. 1997) 113 F.3d 536.) And in *Mesa Operating Co. v. California Union Ins. Co.*

13

(Tex.Ct.App. 1999) 986 S.W.2d 749, the court rejected the insured's argument that salt water contamination from an underground well "occurred suddenly because at one point in time the well was whole and, an instant later, salt water breached the well and began escaping into the aquifer." (*Id.* at p. 757.)

A gradual process, viewed through an electron microscope that can show physical changes occurring in nanoseconds, can appear sudden at certain points in time. Given a small enough time interval, even a slow gradual leak is sudden. There is always a time, $t_1$, before the first water molecule breaches the surface of a corroding pipe, and a time, $t_2$, after the first water breaches the surface, such that the breach can appear sudden if $t_2 - t_1$ is small enough. Such a calculus, however, does not make a gradual release of water sudden. As the trial court stated, "[i]t was not a sudden burst . . . unless you used 'sudden' to just explain at one point in time there was no water, then there was water." In concluding that Kreitenberg's declaration did not create a triable issue of material fact, the trial court properly concluded that "the fact that the pipe's breach only took a fraction of a second does not mean the release of water was 'sudden.'"

2. *The efficient proximate cause doctrine does not apply to the Browns' mold claim*

The Browns recognize that the policy did not include coverage for mold. The policy listed mold as one of 13 uninsured types of loss or damage: "We do not insure loss or damage consisting of, composed of or which is fungi." The policy also listed mold as one of 35 excluded causes of loss or damage: "We do not insure loss or damage directly or indirectly caused by, arising out of or resulting from fungi or the discharge, dispersal, migration, release or escape of any fungi." The Browns argue that their mold damage was covered "because it resulted from direct contact with the abrupt and sudden discharge of water," and under the efficient proximate cause doctrine the sudden discharge of water produced the condensation and, eventually, the mold.

14

The efficient proximate cause doctrine, codified in Insurance Code section 530,[6] provides that when "'"'a loss is caused by a combination of a covered and specifically excluded risks, the loss is covered if the covered risk was the efficient proximate cause of the loss," but "the loss is not covered if the covered risk was only a remote cause of the loss, or the excluded risk was the efficient proximate, or predominate cause."'"'" (*De Bruyn*, *supra*, 158 Cal.App.4th at p. 1216; see *Sabella v. Wisler* (1963) 59 Cal.2d 21, 31-32 ["'[i]n determining whether a loss is within an exception in a policy, where there is a concurrence of different causes, the efficient cause—the one that sets others in motion—is the cause to which the loss is to be attributed, though the other causes may follow it, and operate more immediately in producing the disaster'"].) The efficient proximate cause doctrine "applies only when two or more conceptually distinct perils combine to cause the loss." (*Roberts v. Assurance Co. of America* (2008) 163 Cal.App.4th 1398, 1409.) When "the evidence shows the loss was in fact occasioned by only a single cause, albeit one susceptible to various characterizations, the efficient proximate cause analysis has no application." (*Ibid.*)

The efficient proximate cause doctrine does not apply to the Browns' mold claim for two reasons. First, the efficient proximate cause doctrine applies when "'"'a loss is caused by a combination of a covered and specifically excluded risks.'"'" (*De Bruyn*, *supra*, 158 Cal.App.4th at p. 1216.) The only potentially "covered risk" the Browns point to is "the abrupt and sudden discharge of water." As explained above, as a matter of law no sudden discharge of water occurred. Thus, this is not a situation where there is both a covered risk and an excluded risk. There are only two excluded risks: discharge of water that is not sudden, and mold.

---

[6] Insurance Code section 530 provides: "An insurer is liable for a loss of which a peril insured against was the proximate cause, although a peril not contemplated by the contract may have been a remote cause of the loss; but he is not liable for a loss of which the peril insured against was only a remote cause." "The efficient proximate cause doctrine 'is neither a California invention nor novel.'" (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 753.)

15

Second, two conceptually distinct risks or events did not cause the Browns' loss. In *Finn v. Continental Ins. Co.* (1990) 218 Cal.App.3d 69, where water leaking from a broken sewer pipe "for months or years" had damaged the foundation of the plaintiff's house and the insured's "broad peril policy" excluded damages from "continuous or repeated seepage or leakage of water," the court held that the efficient proximate cause doctrine did not apply. (*Id.* at pp. 70, 71.) The court stated: "Plaintiff argues that the break in the pipe was the efficient predominating cause, the leakage merely an immediate one. That argument is premised on viewing the leakage and the break as two conceptually distinct events, linked only casually. But 'leakage' and 'seepage' necessarily imply some break or gap in the thing leaking." (*Id.* at p. 72.) The court held that the efficient proximate cause doctrine "has no application here because leakage and broken pipes are not two distinct or separate perils. . . . Leakage or seepage cannot occur without a rupture or incomplete joining of the pipes. This case involved not multiple causes but only one, a leaking pipe." (*Ibid.*; cf. *Brian Chuchua's Jeep, Inc. v. Farmers Ins. Group* (1992) 10 Cal.App.4th 1579 [damage caused by a leak from a crack in an underground gasoline storage tank caused by an earthquake was covered despite a pollution exclusion because under the efficient proximate cause doctrine there were "two causes: the earthquake and the leaking tank"].) Similarly, the breaking of the Browns' pipe was not "conceptually distinct" from the leaking, spraying, or streaming of water. Like *Finn*, this case involves only one cause, a leaking/spraying/streaming pipe.

### 3. *The policy is conspicuous, plain, and clear*

The Browns argue that the extension of limited water coverage for damage to property from direct contact with water if the water results from a sudden and accidental discharge of water from a plumbing system is not conspicuous, plain and clear because it should be on page 21 of the policy under "Uninsured Loss or Damage and Excluded

16

Causes of Loss of Damage," rather than on page 14 of the policy under "Extensions of Coverage." This argument is unconvincing.[7]

"Our jurisprudence respecting conspicuousness, consistently with the inherent logic of that concept, refers to how a coverage-limiting provision actually has been positioned and printed within the policy at issue." (*Haynes*, *supra*, 32 Cal.4th at p. 1209.) "'A coverage limitation is conspicuous when it is positioned and printed in a manner that will attract the reader's attention.'" (*Ortega v. Topa Ins. Co.* (2012) 206 Cal.App.4th 463, 476.) The provision of the Browns' policy extending coverage for damage resulting from a sudden and accidental discharge of water, to the extent it is a "coverage-limiting provision," is printed in readable and adequately-spaced print, organized in a helpful outline format, and positioned where it should be in the section listing extensions of coverage. It is not hidden or concealed in fine print, a "dense pack" format, or an overcrowded page. (See *TIG Ins. Co. of Michigan, supra,* 137 Cal.App.4th at p. 759 & fn. 11.) It actually appears earlier in the policy than the Browns contend it should appear. Moreover, the section describing the types of uninsured loss and damage lists water damage as the first uncovered damage, and specifically refers to the prior section of the policy containing the extensions of coverage: "We do not insure loss or damage consisting of, composed of or which is water damage, except as covered under Section I - Extensions of Coverage, Limited water coverage." The section containing the exclusions lists water second and also refers to the limit water coverage section: "Except as Section I - Extensions of Coverage, Limited water coverage, provides for limited coverage for water damage, we do not insure loss or damage directly or indirectly caused by, arising out of or resulting from water." The table of contents refers to all three provisions. (See *Mission Viejo Emergency Medical Associates v. Beta Healthcare Group*

---

[7] Whether a coverage limitation is conspicuous, plain and clear is an issue of law, reviewed de novo. (See *Waller*, *supra*, 11 Cal.4th at p. 18; *Thompson v. Mercury Casualty Co.* (2000) 84 Cal.App.4th 90, 94; *Malcom v. Farmers New World Life Ins. Co.* (1992) 4 Cal.App.4th 296, 300.)

17

(2011) 197 Cal.App.4th 1146, 1157 ["[i]t is conspicuous in both the table of contents and the policy"].)

The limited coverage for water damage from sudden and accidental discharge is also plain and clear. "To be plain and clear, the substance of the exclusion must be precise and understandable," and stated "in words that are part of the working vocabulary of the average layperson." (*TIG Ins. Co. of Michigan*, *supra*, 137 Cal.App.4th at pp. 759-760; *Malcom*, *supra*, 4 Cal.App.4th at p. 301.) The Browns do not identify any language that they claim is not understandable. Although the Browns dispute Mid-Century's interpretation of the terms of coverage provided by the policy, the Browns do not argue that the words in the extension of limited water coverage or the exclusion for water damage (e.g., plumbing, discharge, eruption, overflow, release, constant, repeating, gradual, intermittent, infiltration) are difficult to understand. (Cf. *Haynes*, *supra*, 32 Cal.4th at p. 1205 [permissive user limitation in the Financial Responsibility Law not "understandable to the average policy holder"]; *Cal-Farm Ins. Co. v. TAC Exterminators, Inc.* (1985) 172 Cal.App.3d 564, 578 [exclusion for "liability assumed by the insured under any contract or agreement except an incidental contract" not plain and clear]; *Ponder v. Blue Cross of Southern California* (1983) 145 Cal.App.3d 709, 724 [exclusion for "temporomandibular joint syndrome" not "comprehensible to lay persons"].)

Finally, as noted above, the policy gives an explanation of what is not included in the limited coverage for water damage: "A sudden and accidental discharge, eruption, overflow or release of water does not include a constant or repeating gradual, intermittent or slow release of water, or the infiltration or presence of water over a period of time. We do not cover any water, or the presence of water, over a period of time from any constant or repeating gradual, intermittent or slow discharge, seepage, leakage, trickle, collecting infiltration, or overflow of water from any source . . . whether known or unknown to the insured." The Browns argue that the policy's use of the term "a period of

18

time" in this explanation is "ambiguous and undefined," and that a "reasonable consumer would not understand what a 'period of time' entailed . . . ."[8]

The fact that the policy does not define "a period of time" does not necessarily create ambiguity. (See *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 866; *Carson v. Mercury Ins. Co.* (2012) 210 Cal.App.4th 409, 426-427.) Moreover, although there may be, at the quantum level, some ambiguity in the concept of "a period of time," an average layperson understands generally what "a period of time" is, and understands that for water escaping from a pipe, "one to two months" qualifies. The term "a period of time" has a well-established meaning in the context of running water, and the policy's use of the term is plain and clear.

C. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

The Browns allege that Mid-Century breached the implied covenant of good faith and fair dealing by failing to investigate their claim properly, engaging in unlawful and deceptive claims practices, and refusing to indemnify the Browns under the policy. Because the policy did not cover the Browns' claims, however, the Browns do not have a claim for breach of the implied covenant of good faith and fair dealing. (See *Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 408 ["without coverage there can be no liability for bad faith on the part of the insurer"]; *Cardio Diagnostic Imaging*, *supra*, 212 Cal.App.4th at p. 77, ["because no policy benefits were due under the policy, [the insured's] claim for breach of the implied covenant of good faith and fair dealing cannot be maintained"].)

---

[8] The Browns argue that this alleged ambiguity "leaves it to the insurer to decide what is a 'period of time.'" This suggests that the Browns' are actually arguing that "a period of time" is vague, not ambiguous. (See *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 195 ["[a] policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable"].) Vagueness arises when a term lacks a definition, not when the term may have two or more. (See *Brooklyn Navy Yard Cogeneration Partners v. Superior Court* (1997) 60 Cal.App.4th 248, 258 [a vague term "has no specific definition or content"].)

19

## DISPOSITION

The judgment is affirmed.  Mid-Century is to recover its costs on appeal.


SEGAL, J.*


We concur:



PERLUSS, P. J.




JACKSON, J.

---

*        Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 4/24/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| LEROY BROWN et al., | B238357 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC433800) |
| v. | |
| MID-CENTURY INSURANCE COMPANY, | **ORDER MODIFYING AND CERTIFYING OPINION FOR PUBLICATION (NO CHANGE IN JUDGMENT)** |
| Defendant and Respondent. | |

THE COURT:

The opinion in this case filed April 2, 2013 was not certified for publication. It appears the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), respondent and non-parties' requests pursuant to California Rules of Court, rule 8.1120(a) for publication are granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

IT IS FURTHER ORDERED that the opinion be modified as follows:

1. On page 2, the words "defendant and respondent" are deleted from the first sentence of the first paragraph so the sentence reads:

> Leroy and Terrie Brown appeal the trial court's judgment in favor of Mid-Century Insurance Company on the Browns' claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

2. On page 14, when referencing $t_2$ in the third sentence of the first full paragraph, insert the word "molecule" between the words "water" and "breaches" so that the sentence reads:

> There is always a time, $t_1$, before the first water molecule breaches the surface of a corroding pipe, and a time, $t_2$, after the first water molecule breaches the surface, such that the breach can appear sudden if $t_2 - t_1$ is small enough.

_____

    PERLUSS, P. J.            JACKSON, J.            SEGAL, J.[*]

_____

[*]    Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution